HARLEYSVILLE INSURANCE COMPANY, Defendant Below, Appellant, Cross–Appellee,

v.

The CHURCH INSURANCE COMPANY, Plaintiff Below, Appellee, Cross–Appellant, and National Union Fire Insurance Company of Pittsburgh, PA., Defendant Below, Appellee and Charles A. Brown, Plaintiff–Below, Appellee.

No. 221,2005.

Supreme Court of Delaware.

Submitted: Oct. 26, 2005.

Decided: Nov. 16, 2005.

Stephen P. Casarino (argued) and Thomas P. Leff (argued) of Casarino, Christman & Shalk, P.A., Wilmington, DE, for appellant Harleysville Insurance Company.

Daniel A. Griffith (argued) and Jos. Scott Shannon of Marshall Dennehey War-

ner Coleman & Goggin, Wilmington, DE, for appellee the Church Insurance Company.

Anthony G. Flynn and Timothy J. Houseal of Young, Conaway, Stargatt & Taylor, L.L.P., Wilmington, DE; John C. Sullivan (argued) of Post & Schell, P.C., Philadelphia, PA, for appellee National Union Fire Insurance Company.

Before STEELE, Chief Justice,
HOLLAND, and BERGER, Justices.

STEELE, Chief Justice.

A personal injury plaintiff, Charles Brown, was injured when a fire escape ladder attached to the property owned by Cathedral Community Services and managed by Capital Management Company fell on his head. Cathedral had a general liability policy with Church Insurance Company and an excess umbrella policy with National Union Fire Insurance Company. Capital had a general liability policy with Harleysville Insurance Company. Church defended Cathedral in the ensuing personal injury litigation. Harleysville defended Capital. Harleysville argued before the Superior Court and before this Court that Capital was an additional, though unnamed, insured under the policy Church issued to Cathedral and that Church had the primary duty to defend Capital. On cross-motions for summary judgment, the Superior Court held, *inter alia*, that Church did have a duty to defend Capital as an additional insured, but that Harleysville, acting on behalf of Capital, waived Capital's right to a defense from Church by failing to conduct a pretrial inquiry into Capital's potential coverage under the policy Church issued to Cathedral and by seizing the defense of Capital in Brown's personal injury action. Harleysville appeals this judgment. Because the record clearly shows that Harleysville failed to conduct an investigation using its customary procedures into whether its insured, Capital, was covered under Church's policy, and for the reasons articulated in the Superior Court's opinion, we affirm.

### Facts

On June 1, 1994, Cathedral Community Services, the owner of a property located at 2001 N. Market Street in Wilmington, Delaware, entered into a written contract with Capital Management Company whereby Capital agreed to manage and maintain the Market Street property, as well as other properties Cathedral owned. The written contract expired in 1995.

On August 23, 1999, Charles Brown was standing underneath an exterior fire escape attached to the side of 2001 N. Market Street. Brown touched the bottom step of the fire escape ladder, and the ladder section fell striking Brown on the head and severely injuring him. The ladder section fell because a heavily corroded supporting metal cable broke releasing the ladder and a counterweight.

At the time of the injury, Cathedral had a primary liability insurance policy with policy limits of $1,000,000 with Church Insurance Company. Cathedral also had an umbrella excess policy with National Union Fire Insurance Company of Pittsburgh with limits of $50,000,000.[1] Capital had a general liability insurance policy with limits of $1,000,000 issued by Harleysville Insurance Company. The Cathedral–Church insurance policy contained a provision that stated in "Section II–Liability Coverage" that " 'Insured' means ... any person or

---

1. An insurance company with an excess policy only pays after the primary policy is exhausted.

organization while acting as real estate manager for the named Insured." The Harleysville–Capital policy had a provision that stated "with respect to your liability arising out of your management of property for which you are acting as real estate manager this insurance is excess over any other valid and collectible insurance available to you."

On August 23, 1999, Capital notified *Church* of the accident.[2] After Capital notified Church, Cathedral, Church's named insured, also notified Church of the claim and requested a defense and indemnity. Church assigned Crawford & Company to investigate the claim. Church also assigned defense counsel to defend Cathedral in any litigation.

On October 21, 1999, Brown filed a personal injury action against Cathedral and Capital. He filed an amended complaint on January 11, 2000. Upon receipt of Brown's amended complaint, Capital's principal, Gary Hayman called Harleysville and turned the claim over to them. Hayman informed Harleysville that Cathedral was self-insured. Acting solely on its insured's statement and without any other due diligence investigation of the statement's accuracy, Harleysville referred the lawsuit to outside counsel to defend Capital in the upcoming litigation. Harleysville's counsel entered an appearance on February 6, 2000.

After hearing from Hayman that Cathedral was self-insured, on March 7, 2000, in his claims notes, one of Harleysville's claim adjusters expressed some insight into what would happen if Cathedral were in fact, contrary to Hayman's statement, insured by another company: "Too bad owner is self-insured, or insured [Capital] would be covered under their [Cathedral's

commercial insurance] policy." At a later deposition testimony, one of Harleysville's litigation specialists, Barbra Jorgenson, explained Harleysville's general policy of ascertaining or at least attempting to ascertain whether its insured is covered under another policy:

> Q: (Church's attorney): And once Harleysville found out that Cathedral was covered by a commercial carrier's policy, Harleysville would have then undertaken some investigation as to whether its insured, Capital, was entitled to coverage under the Cathedral policy; correct?
>
> A: (Ms. Jorgenson): Correct.

On March 16, 2000, Cathedral filed its answer to Brown's amended complaint. At the same time, Cathedral filed the required answers to Form 30 interrogatories. In response to interrogatory six, which asks for a "brief description of any insurance policy, including excess coverage, that is or may be applicable to the litigation" Cathedral answered that Church Insurance Company was its insurance carrier and that the policy was a liability policy with $1,000,000 limits. Cathedral also provided the policy number. According to Harleysville's litigation specialist's testimony, at this point, Harleysville, under its normal procedures, after finding out that Cathedral was covered by a commercial policy, should have undertaken some investigation to determine whether Capital was covered under the policy Church issued to Cathedral. Harleysville never undertook this investigation. Rather than conducting a timely investigation into whether Capital was covered under Cathedral's policy, on March 17, 2000, Harleysville filed Capital's answer to Brown's complaint with a cross-claim

2. *Brown v. Church Ins. Co, et al.*, Memorandum Opinion, C.A. No 02C–06–196, March 24, 2005 at 11.

against Cathedral. From this point on, Harleysville conducted Capital's defense.

On or about August 21, 2001 all the parties, and their insurance carriers, attended mediation. As a result of the mediation, Church and Brown reached a settlement agreement whereby Church paid $525,000 to settle Brown's claims against Cathedral and the parties signed a joint tortfeasors release. At this point, Harleysville offered $25,000 to resolve Brown's claim against Capital.

With trial scheduled to begin on Monday, September 10, 2001, on Thursday, September 6, Harleysville's attorney sent a letter to Church's attorney inquiring into potential coverage for Capital under the Church policy. Church's attorney responded that Capital was "not named as an additional insured on any policy covering the subject property at the time of Mr. Brown's accident."

On September 7, 2001, *one business day before trial,* Harleysville purported to tender Capital's defense to Church. Church declined the tender.

After a four day trial in the Superior Court, at which Cathedral, who had already settled, did not appear, the jury awarded Brown $2,250,000 in damages, with liability apportioned between the defendants at 60% ($1,350,000) against Capital, and 40% ($900,000) against Cathedral.

Capital appealed several of the trial judge's rulings to this Court.[3] On December 18, 2002, we held that the trial judge did not err by allowing the jury to determine the terms of an implied in fact contract between Capital and Cathedral after the expiration of the 1994 written agreement. We also noted that a "rational jury could easily conclude that Capital knew

Cathedral intended and expected that Capital would maintain the exterior features of the property according to the [Wilmington] Code." [4]

On June 25, 2002, Brown brought suit to enforce the judgment. This appeal arises out of the Superior Court's March 24, 2005 opinion ruling on several motions for summary judgment resolving the insurance companies' obligations against each other and to Brown.

### *The Superior Court Opinion*

In Brown's suit to enforce the judgment, which was essentially a declaratory judgment action to determine liability insurance coverage, all of the insurance companies involved moved for summary judgment on different issues.

1)

 a. Harleysville moved for summary judgment against National Union on the grounds that Harleysville's insurance policy issued to Capital was excess to the National Union policy issued to Church.

 b. National Union moved for summary judgment against Harleysville on the grounds that the policy National Union issued to Church was an umbrella policy and was excess to any primary insurance policy— Church's or Harleysville's.

2) Harleysville sought summary judgment that Capital was an additional insured under the Church policy issued to Cathedral.

3) Church sought summary judgment that Capital was not entitled to coverage under the Church policy because Capital failed to comply with the notice provisions in the Church policy.

---

**3.** *Capital Mgmt. Co. v. Brown,* 813 A.2d 1094 (Del.2002).

**4.** *Id.* at 1098.

4) Harleysville sought summary judgment that the Church policy was the primary coverage and the Harleysville policy was excess to Church's policy.

5) Harleysville sought summary judgment that Church had the duty to defend Capital as an additional insured under the Church policy.[5]

On the first issue the trial judge held that the Harleysville policy issued to Capital was not an excess coverage policy in relation to the National Union umbrella policy issued to Church.[6] The trial judge found that the National Union policy was not a primary policy but an umbrella or excess policy.[7]

On the second issue, the trial judge held that Capital was an additional insured under the clear language of the Church policy.[8] On the third issue, the trial judge held, that as to notice of loss, Capital was not required to give additional notice to Church because the notice requirement was fulfilled when Cathedral notified Church of Brown's claim and requested indemnity.[9] On the fourth issue, the trial judge held that the Harleysville policy was excess to the Church policy.[10]

On the fifth issue, the trial judge held that, although Capital did not formally tender its defense to Church until right before the trial was to begin in the underlying case, the notice of loss to Church triggered a potential duty to defend Capital. As an insurer under the policy Church issued to Cathedral, Church had a duty to defend Capital. Capital had a right to be defended or to knowingly waive that defense.[11]

The trial judge also held that after Harleysville became aware of Church's involvement in the action it was incumbent upon Harleysville to determine what rights Capital may have had under the Church policy. By not determining Capital's rights under the Church policy and by conducting the pre-trial defense of Capital, Harleysville waived Capital's right to a defense by Church.[12]

Accordingly, the trial judge settled the responsibilities of the insurance companies as follows:

Church, as the primary insurer for Cathedral and Capital, is responsible for the amount of the judgment up to Church's policy limits as well as the resulting post-judgment interest on that amount. Because Harleysville waived Church's duty to defend Capital, Church is responsible only for the defense costs associated with its defense of Cathedral (including the post-trial costs associated with the case at bar) and does not have to reimburse Harleysville for its defense of Capital. Harleysville as the excess insurer is responsible for the amount of the judgment that exceeds the policy limits of the Church policy and the resulting post-judgment interest on that amount. Having waived Capital's right to a defense from Church, Harleysville is responsible for the defense cost associated with its defense of Capital (including the post-trial costs associated with the case at bar) and does not have a right to be reimbursed for defense costs

---

5. Memorandum Opinion at 2.

6. *Id.* at 7.

7. *Id.* at 9.

8. *Id.* at 19.

9. Id. at 20.

10. Id. at 21.

11. *Id.* at 23–25

12. Id. at 25–26.

from Church.[13]

## Discussion

 We agree with the reasoning in the trial judge's opinion. Accordingly, we affirm on the basis thereof. We write separately to clarify why Harleysville waived its right to recoup its defense costs in this case.[14] The trial judge correctly noted that "Capital was not required to give additional notice to Church because the notice requirement was fulfilled when Cathedral notified Church of Brown's claim and requested indemnity."[15] The trial judge also correctly noted that "Church knew or should have known from the investigation it performed that Capital was the real estate manager and was potentially an additional insured under the Cathedral policy."[16] Church, therefore, had the initial duty to notify Capital that it was potentially an additional insured under the Church's policy. Finally, the trial judge correctly noted that "as an insurer under the Church policy issued to Cathedral, Church had a duty to defend Capital. Capital had a right to be defended or to

'knowingly' waive that defense."[17] The trial judge's opinion, however, does not sufficiently explain how Capital, through Harleysville, knowingly waived its right to a defense from Church when Church was under an initial obligation to know that Capital was an additional insured and to notify Capital of the available coverage.

In its opening brief, Harleysville contends that it "did not know that Capital was insured under the Church policy. For its part, Church did everything it could to keep that information from Harleysville." Harleysville continues "because the record clearly shows that Harleysville was unaware that Capital was insured under the Church policy until long after the underlying litigation ended, the court erred as matter of law in concluding that Harleysville waived Capital's rights to a defense...." Harleysville's contentions are without merit. The record clearly shows that Harleysville, had it followed its customary procedures and conducted an investigation into potential coverage after its own insured notified Church of the occur-

13. *Id.* at 27. Under the facts as the parties presented them to us, we note that neither Capital nor Cathedral is "out of pocket" anything. The jury found Brown's damages to be $2,250,000 with Capital liable for 60% or $1,350,000 and Cathedral liable for 40% or $900,000. Cathedral's settlement and joint tortfeasor release limited its liability to $525,000. Church, Cathedral's insurer, presumably paid this amount. Accordingly, only the $1,350,000 remains unsatisfied. Under the trial court's judgment, Church is also liable for $475,000 of the $1,350,000 as well as post-judgment interest on that amount. Harleysville, Capital's insurer, is liable for $875,000 as well as post-judgment interest thereon. These liabilities are well within both Capital and Cathedral's $1,000,000 limits on their respective insurance policies with Harleysville and Church.

14. Harleysville frames the issue as whether Harleysville could and did waive Capital's right to a defense. The underlying personal

injury litigation that gave rise to this appeal has been over for several years. We think the issue is more appropriately whether Church is obligated to reimburse Harleysville for the costs Harleysville incurred in defending Capital. Capital received a complete and competent defense in this lawsuit. It does not matter now whether Capital received the defense from Harleysville or from Church. Moreover, Capital itself is not obligated to pay any of the judgment against it.

15. *Id.* at 19–20. (*Citing* 13 Couch on Insurance 3D § 187:12 (1999) ("Where an insurer receives proper and timely notice of accident from the named insured, including particulars sufficient to identify the additional insured, it is not necessary that another notice be given by the additional insured.")).

16. *Id. at* 20.

17. *Id.* at 25.

rence and after being put on notice by Church's answer to the Form 30 interrogatories, would have discovered Church's obligation to defend and indemnify Capital under the policy Church issued to Cathedral.

Harleysville and Capital claim that they initially had no knowledge of the Church policy covering Cathedral. For some reason, on January 31, 2000, Hayman informed Harleysville that Cathedral was self-insured.[18] Remarkably enough, it appears that on "August 23, 1999, *Capital notified Church* [Insurance Company] of the accident."[19] Neither Harleysville nor Capital explained how or why Capital apparently knew that Church insured Cathedral in August 1999, but only five months later somehow thought that Cathedral was self-insured. In any event, after March, 16, 2000, the date Cathedral filed its answer to Brown's amended complaint and the answers to Form 30 interrogatories, Harleysville, on constructive notice of such a policy, could no longer plead ignorance to the existence of another source of coverage for Capital. As of that filing, neither Capital nor Harleysville could reasonably continue to assume that no other carrier might be responsible for Capital's defense. According to Harleysville's litigation specialist's testimony, at this point, Harleysville, under its normal procedures, after finding out that Cathedral was covered by a commercial policy, should have undertaken some investigation to determine wheth-

er Capital was covered under the policy Church issued to Cathedral. Harleysville never undertook this investigation nor did Harleysville's counsel acting for Capital file pretrial discovery exploring the details of the policy Church had issued to Cathedral.

From the record it appears that Harleysville never sent interrogatories or requests for production to Cathedral. Indeed, as noted in its brief, Harleysville took no action until, "[a]fter Church settled Brown's claim against Cathedral [on August 20, 2001] but [two business days] before trial, [on September 6, 2001] Capital requested a copy of the Church policy, which had never been produced, and asked Church for a defense." Harleysville continued: "Church refused to take over the defense and refused to produce a copy of its insurance policy. The policy was finally produced pursuant to a motion to compel." Superficially, this statement makes Church look culpable and indeed lends support to Harleysville's argument that Church did everything it could to keep coverage information from Capital. Nevertheless, a closer look at Harleysville's citations supporting its statement of facts and the dates is instructive and undercuts Harleysville's position. In support of the statement in the brief that Church only produced the policy pursuant to a motion to compel, Harleysville cited to the record of the hearing on a motion to compel[20] that the

---

**18.** Harleysville's claim adjuster, in his notes dated January 31, 2000, states: "Called and discussed this claim with Gary Hayman at Capital Management Co. ... He says the building owner is self-insured...."

**19.** Memorandum Opinion at 11 (emphasis added). The trial judge cited to the deposition testimony of Michael Lindgren, Church's claims handler, as support for this statement. At the deposition, plaintiff's counsel examined Lindgren about a "Notice of Loss" form that stated: "8/23/99, building management, first

call received approximately 11:35; incident happened earlier on fire escape."

**20.** The only language from this citation possibly supporting the "fact" in Harleysville's brief comes from two statements plaintiff's counsel made during the motion to compel: "Once plaintiff obtained the judgment and sought payment of the judgment, Capital Management Company sought production of the Church Insurance Company policy. Church Insurance Company objected to that at first. There was a motion to compel filed,

Superior Court commissioner heard on *May 10, 2004* and to the deposition testimony[21] of Michael Lindgren, a Church claims adjuster, taken on *March 12, 2004.*

In an earlier portion of the transcript of the hearing on the motion to compel, not included in Harleysville's appendix, while Ms. Aronson, an attorney representing Brown, was giving the Commissioner background facts, the following interchange occurred:

> Ms. Aronson: In the answers to Form 30 interrogatories, Cathedral, the owner, never disclosed that Church insured both the owner and the real estate manager. So we went through a trial, not knowing that the Church Insurance Company actually insured the real estate manager as well. . . .

> The Court: Now you said they didn't disclose. Was there discovery propounded that would have required them to disclose that?

> Ms. Aronson: There was [sic] the answers to the Form 30 interrogatories which require the disclosure of insurance covering the risk and the limits on that. But I do not recall there being additional discovery propounded.[22]

Rather than conducting a timely investigation into whether Capital was covered under Cathedral's policy, on March 17, 2000 Harleysville's designated counsel filed Capital's answer to Brown's complaint and Cathedral's cross-claim. From this point on, Harleysville conducted Capital's defense. It was not until September 6, 2001, *almost a year and a half after receiving Cathedral's Form 30 interrogatory answers,* that Harleysville's defense attorney, in a letter to Church's attorney, *informally* inquired into potential coverage under Cathedral's policy. He specifically asked whether "Capital Management was a named insured under the policy in effect at the time of the original contract, 1994, and at the time of the accident. . . ." He also asked for a copy of the portions of the policies that identified the "named insureds." More importantly, Harleysville's attorney noted "[a]lthough Capital. . .may not be specifically named, it may be named in general, i.e., general manager." The Harleysville attorney's letter to Church's counsel designated for Cathedral clearly shows that he, like Harleysville's litigation specialist, knew that it was possible for Capital to be insured under Cathedral's commercial policy, even though Capital was *not specifically named* as an additional insured. Church's response to Harleys-

---

heard by Judge Carpenter. That was granted. Church Insurance Company discloses its policy, and in the language under additional insured, is listed the real estate manager, or Capital Management Company." And "[w]e have taken the deposition of the claims adjuster, Michael Lindgren. This motion to compel is—or seeks production of the documents considered privileged by the Church Insurance Company."

21. The relevant interchange was:

Q: (Plaintiff's counsel): And *after the verdict in this case,* [*Harleysville's attorney*] filed a motion with the Superior Court to produce the insurance company policy. And your

understanding is that the request was resisted? (emphasis supplied)
A: That I don't remember.
Q: You don't remember that the lawyer went to court and opposed production of the policy? Don't remember that?
A: I don't know.

22. It is interesting to note that the Superior Court Commissioner, though understandably unfamiliar with the facts of the case, nevertheless, intuitively thought to ask whether there was discovery propounded that would have required Church either to admit that it insured both Cathedral and its real estate manager, Capital, or to produce the policy itself.

ville's attorney's letter, that Capital was "not named as an additional insured on any policy covering the subject property at the time of Mr. Brown's accident," was, as the trial judge found, "technically correct."[23] The response, as Church's attorney conceded at oral argument, probably did not comport with the spirit of Harleysville's inquiry. Nevertheless, even assuming the trial judge was mistaken in looking only to the "letter" of Church's response instead of its "spirit", Church's response has no bearing on the waiver issue in this case.

■ The critical time period with respect to the waiver issue is the one beginning after Harleysville received the Form 30 interrogatories and ending before trial. At the hearing on the motion to compel, Brown's attorney corroborated what was already clear from the docket entries of the personal injury litigation: no party filed discovery trying to determine whether Capital was an insured under the Church policy before Brown's personal injury trial.[24] The motion to compel that Harleysville emphasizes so heavily in its brief came only after the jury verdict and as part of the second lawsuit (at issue here) attempting to enforce the judgment in the first lawsuit. The motion to compel, and Church's course of conduct after the verdict, are thus, *entirely irrelevant*, to the waiver issue. Once a right is waived, it is gone forever.[25] Accordingly, Harleysville's focus in its brief and at oral argument on Church's resistance to discovery *after Brown's personal injury trial* is a red herring. While Church's conduct was less than ideal insofar as Church failed to correctly determine its legal obligation, failed to determine that Capital was an additional insured, failed to notify Capital, and failed to answer Harleysville's last minute desperate September 6, 2001 letter according to the spirit of its inquiries, Church's conduct does not obligate it to indemnify Harleysville for the costs Harleysville incurred in defending Capital. Harleysville simply failed, for whatever reason, to use the available informal investigative and formal discovery process to resolve the issue of which carrier owed Capital a defense before the discovery period closed, motion practice ended, and trial began.[26] Accordingly, the record supports the trial judge's finding that:

> [e]ven though silence by an insured is not a waiver of the right to a defense, by not determining Capital's rights under the Church policy and by conducting the pre-trial defense of Capital, Harleysville waived Capital's right to a defense by Church. Church was arguably entitled to interpret Harleysville's actions as a waiver of the right to a defense.[27]

**23.** Memorandum Opinion at 12.

**24.** Indeed, Church notes in its brief that "neither Harleysville nor Capital undertook to discover the insurance policy in the Brown personal injury litigation," and, "Harleysville[,] acting on behalf of Capital, made no inquiry of either Church or its insured[,] Cathedral[,] as to any other applicable insurance coverage until two business days before trial...." The trial judge, too, noted "[i]t does not appear that Harleysville inquired of Church as to Capital's potential status as an insured under the Church policy prior to September 6, 2001." Memorandum Opinion at 12.

**25.** *Hanson v. Fidelity Mut. Ben. Corp.*, 13 A.2d 456, 460 (Del.Super.1940) (*citing* 67 C.J.S. WAIVER § 14, at 313 (1934)).

**26.** We wish to reemphasize, as the trial judge did, that "neither insurance company, Church nor Harleysville, handled the claim or their respective insureds in an ideal manner. The post-judgment litigation in the instance case could have been avoided by better communication between the parties and their insureds, and with each other." Memorandum Opinion at 17.

**27.** *Id.* at 26.

### Conclusion

Based on the foregoing and the trial court's well-reasoned opinion, the March 24, 2005 Order of the Superior Court deciding the summary judgment motions is AFFIRMED.